REBECCA EISEN, State Bar No. 096129
JENNIFER SVANFELDT, State Bar No. 233248
MORGAN, LEWIS & BOCKIUS, LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1126
Tel:  415.442.1000
Fax:  415.442.1001
reisen@morganlewis.com
jsvanfeldt@morganlewis.com

JILL A. PORCARO, SBN 190412
MORGAN, LEWIS & BOCKIUS LLP
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071
Tel:  213.612.2500
Fax:  213.612.2501
jporcaro@morganlewis.com

Attorneys for Defendant
SERVISAIR, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT NAVARRO,<br><br>　　　　　　Plaintiff,<br><br>　　vs.<br><br>SERVISAIR, a Limited Liability Corporation; and DOES 1 through 50, Inclusive,<br><br>　　　　　　Defendant. | Case No. CV-08-2716-MHP<br><br>**DECLARATION OF CRAIG ALLEN IN SUPPORT OF SERVISAIR LLC'S OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**<br><br>Date:  August 4, 2008<br>Time:  2:00 p.m.<br>Dept.:  Courtroom 15 |

I, Craig Allen, declare:

　　1.　　I submit this declaration in support of Servisair LLC's Opposition to Plaintiff Robert Navarro's Motion To Remand.  All of the following facts are within my personal knowledge and if called as a witness I could and would testify competently with respect thereto.

　　2.　　I am the Vice President of Human Resources for Servisair LLC ("Servisair") and have been employed by the company since September 17, 2001.  From September 17, 2001 through October 13, 2003, I was employed by Servisair as the Regional Human Resources Director U.S.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

DECL. OF C. ALLEN ISO SERVISAIR LLC'S OPPOSITION TO
PLAINTIFF'S MOTION TO REMAND

CASE NO. CV-08-2716-MHP

1    East.  On October 13, 2003, I was promoted to the Vice President of Human Resources.  As a

2    member of Servisair's senior management team, I am responsible for directing all of the human

3    resources functions in the Servisair division.  I oversee, among other things, the administration of

4    payroll and health benefits and the collective bargaining between the company and the unions.

5        3.    I am familiar with the operations and administration of Servisair and its owners.  The

6    statements made in this declaration are based on my first-hand knowledge of the operations and

7    administration of Servisair and its owners.

8        4.    **Servisair LLC's Owners.**  Servisair LLC has two owners which collectively hold 100%

9    of the ownership interests of the company: (1) Servisair Holding Corp.; and (2) Penauille Holding

10   Inc.

11       5.    **Servisair Holding Corp.**  Servisair Holding Corp. ("Servisair Holding") holds 64.2% of

12   the ownership interests of Servisair.  The corporation is organized under the laws of Delaware.

13   Its corporate headquarters are located in Houston, Texas.  Servisair Holding does not have any

14   employees and none of its business activities substantially predominate in California.

15       6.    Servisair Holding's Chief Executive Officer ("CEO") resides in Paris, France and works

16   in Manchester, England.  Servisair Holding's President, Vice President, General Counsel and

17   Secretary, and Treasurer reside and work in Houston, Texas.  One of Servisair Holding's Board

18   of Directors resides in Paris, France and works in Manchester, England.  The rest of Servisair

19   Holding's Board of Directors reside and work in Houston, Texas.

20       7.    Servisair Holding does not hold any tangible property or generate any revenue apart from

21   its interests in Servisair LLC.

22       8.    **Penauille Holding Inc.**  Penauille Holding Inc. ("Penauille") is organized under the laws

23   of Delaware.  It holds 35.8% of the ownership interests of Servisair and its corporate headquarters

24   are located in Houston, Texas.  Penauille does not have any employees and none of its business

25   activities substantially predominate in California.

26       9.    Penauille's CEO resides in Paris, France and works in Manchester, England.  Penauille's

27   President, Vice President, General Counsel and Secretary, and Treasurer reside and work in

28   Houston, Texas.  One of Penauille's Board of Directors resides in Paris, France and works in

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

2

DECL. OF C. ALLEN ISO SERVISAIR LLC'S OPPOSITION TO
PLAINTIFF'S MOTION TO REMAND                                    CASE NO. CV-08-2716-MHP

1   Manchester, England.  The rest of Penauille's Board of Directors reside and work in Houston,

2   Texas.

3       10.  Penauille does not hold any tangible property or generate any revenue apart from its

4   interests in Servisair LLC.

5       11.  **Servisair LLC's State of Incorporation.**  Servisair is, and was at the time of the

6   institution of this action, a limited liability company organized and existing under the laws of

7   Delaware.

8       12.  **Servisair LLC's Employees.**  As of April 1, 2008, Servisair had approximately 3,507

9   employees nationwide.  Approximately 952 of those employees were employed in California, 505

10  were employed in New York, 416 were employed in Illinois, 377 were employed in Florida, 345

11  were employed in Massachusetts and 278 were employed in Nevada.  As of April 1, 2008,

12  approximately 405 ramp agents were employed in California

13      13.  A total of 2,858 hourly employees worked for Servisair in California between April 2004

14  and April 2008, 1,990 of which no longer work for the company.

15      14.  **Property.**  As of July 1, 2007, Servisair provided ground services in 12 States.  As of

16  April 2008, this number had increased to 19 States.  The largest amount of Servisair LLC's

17  tangible property is located in New York.  As of April 1, 2008, approximately 24% of Servisair's

18  tangible property is located in New York, 21% of its tangible property is located in Illinois, 16%

19  of its tangible property is located in California, 6% is located in Florida, 6% is located in

20  Massachusetts and 5% is located in Nevada.

21      15.  **Income.**  For the period ending March 31, 2008, approximately 28% of the total revenue

22  generated by Servisair was generated in California, 26% of the total revenue was generated in

23  New York, 14.3% of the total revenue was generated in Illinois, 11% of the total revenue was

24  generated in Massachusetts, 9% of the total revenue was generated in Florida and 6% of the total

25  revenue was generated in Nevada.

26      16.  **Servisair LLC's Executives.**  Servisair LLC's CEO resides in Paris, France and works

27  in Manchester, England.  Servisair LLC's President, Vice President, General Counsel and

28  Secretary, Treasurer, Vice President of Human Resources, Regional Vice President, and Vice

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

3

DECL. OF C. ALLEN ISO SERVISAIR LLC'S OPPOSITION TO
PLAINTIFF'S MOTION TO REMAND

CASE NO. CV-08-2716-MHP

1    President and Controller all work and reside in Houston, Texas.

2         17. **Servisair LLC's Administrative Functions**. The following Servisair LLC

3    administrative functions are located in Houston, Texas: payroll, human resources, accounting,

4    finance, marketing and information systems. Servisair's legal department also is located in

5    Houston, Texas.

6         18. **Plaintiff's Employment and Collective Bargaining Agreements.** In September 2001,

7    a predecessor to Servisair acquired Monarch Aviation, which at that time employed Plaintiff

8    Robert Navarro at its facility located at SFO. Since that time, Mr. Navarro has been employed as

9    a ramp agent by Servisair at SFO pursuant to a national collective bargaining agreement

10   ("National CBA") and a local supplemental collective bargaining agreement ("Local CBA"),

11   which govern the terms and conditions of his employment. A true and correct copy of the

12   National CBA is attached as Exhibit A. A true and correct copy of the Local CBA is attached as

13   Exhibit B.

14        19. The National CBA governs, among other things, Mr. Navarro's hours of work and shift

15   schedules and overtime. Representatives of Servisair considered the schedules and routes of the

16   airlines in bargaining for these terms. The National CBA also provides a Grievance Procedure

17   which governs all disputes between Servisair and the Union concerning the interpretation or

18   application of the terms of the contract.

19        20. The Local CBA governs the terms and conditions of Mr. Navarro's employment because

20   he is part of the bargaining unit described as ramp agents, aircraft cleaners and ground support

21   equipment mechanics employed by Servisair at SFO. For example, the Local CBA governs the

22   bargaining unit's hours of work and shift schedules, rates of pay, overtime and benefits, terms

23   which also were bargained for in light of the routes and schedules of the airlines.

24        21. Servisair must comply with the particular directives of its customer airlines, as well as

25   meet the standards for employers at the San Francisco International Airport ("SFO") as set forth

26   in the airport's Quality Standards Program ("QSP"). These standards govern employee benefits

27   and compensation, training and safety and employer hiring practices. Servisair is required to

28   comply with the QSP and it may be assessed fines for violating the program. According to the

program, it was adopted by the San Francisco Airport Commission, and was created to enhance

security and safety at SFO. A true and correct copy of the QSP is attached as <u>Exhibit C</u>.

22. The QSP is incorporated into the Local CBA. The Local CBA acknowledges that

employers subject to the San Francisco QSP must comply with the standards imposed by the

program. Article V. of the Local CBA provides the following:

> Effective January 1, 2007, $11.50 per hour shall be the minimum wage rate in effect for Full time Ramp Agents, Aircraft Cleaners and GSE Mechanics, and adjusted on each January 1 thereafter, based on the annual percentage change in the Bay Area Cities Consumer Price Index as published by the San Francisco Airport Commission pursuant to the San Francisco International Airport Quality Standards Program (QSP). These wages reflect the "with benefits" rate called for in the QSP.

> Effective January 1, 2007, $12.75 per hour shall be the minimum wage rate in effect for Part time Ramp Agents, Aircraft Cleaners, and GSE Mechanics and adjusted on each January 1 thereafter, based on the annual percentage change in the Bay Area Cities Consumer Price Index as published by the San Francisco Airport Commission pursuant to the San Francisco International Airport Quality Standards Program (QSP). These wages reflect the "without benefits" rate called for in the QSP.

23. "With benefits" includes employee receipt of some or all the following benefits under the

QSP: (1) vacation; (2) sick days; and (3) health care coverage. Servisair is required to, and does,

submit an "Annual Employer Certification" to the QSP on an annual basis, certifying that it

"offers" these three benefits to its employees, in addition to offering them the option of making a

compensation selection of the lower rate plus the aforementioned three benefits or the higher rate

without them. All Servisair employees are provided the first two benefits, vacation and sick days,

even if they decline the third health care coverage benefit. A true and correct copy of Servisair's

most recent Annual Employer Certification which was submitted to the QSP is attached as

<u>Exhibit D</u>.

24. Pursuant to the terms of the QSP, at the time Mr. Navarro filed this lawsuit, his hourly

rate of pay was $11.88 under the QSP and CBA. Mr. Navarro's hourly rate of pay has since

increased to $13.13.

25. According to prior versions of the QSP, the difference between the higher and lower

hourly rate has always been $1.25.

26. Pursuant to several ground handling agreements between Servisair and its airline

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

DECL. OF C. ALLEN ISO SERVISAIR LLC'S OPPOSITION TO
PLAINTIFF'S MOTION TO REMAND

CASE NO. CV-08-2716-MHP

1    customers, Servisair is required to comply with the terms and conditions of an International Air

2    Transport Association ("IATA") Standard Ground Handling Agreement ("SGHA").

3        I declare under penalty of perjury under the laws of the State of Texas that the foregoing is

4    true and correct. Executed the _11th_ day of July 2008, at Houston, Texas.

Craig Allen

9    DB2/20751624.1

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

DECL. OF C. ALLEN ISO SERVISAIR LLC'S OPPOSITION TO
PLAINTIFF'S MOTION TO REMAND                CASE NO. CV-08-2716-MHP

# EXHIBIT A

**NATIONAL AGREEMENT**


**GLOBEGROUND NORTH AMERICA LLC**
**D/B/A SERVISAIR/GLOBEGROUND**

**AND**

**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE**
**WORKERS, AFL-CIO**


**DECEMBER 1, 2005 – NOVEMBER 30, 2010**

## TABLE OF CONTENTS

| | | |
|---|---|---|
| PREAMBLE | | 1-3 |
| ARTICLE I | RECOGNITION | 3-5 |
| ARTICLE II | UNION SHOP | 5 |
| ARTICLE III | CHECK OFF | 5 |
| ARTICLE IV | HOURS OF WORK | 6 |
| ARTICLE V | RATES OF PAY | 7 |
| ARTICLE VI | OVERTIME | 7 |
| ARTICLE VII | HOLIDAYS | 8 |
| ARTICLE VIII | VACATIONS | 8 |
| ARTICLE IX | SENIORITY | 9 |
| ARTICLE X | COMPANY MANAGEMENT | 10 |
| ARTICLE XI | GRIEVANCE PROCEDURE | 13 |
| ARTICLE XII | ARBITRATION | 14 |
| ARTICLE XIII | NO STRIKE CLAUSE | 15 |
| ARTICLE XIV | BENEFIT PLANS | 16 |
| ARTICLE XV | PAY FOR DEATH IN FAMILY | 17 |
| ARTICLE XVI | JURY DUTY | 18 |
| ARTICLE XVII | GENERAL CONDITIONS | 18 |
| ARTICLE XVIII | SHOP STEWARD | 19 |
| ARTICLE XIX | DISCRIMINATION | 19 |
| ARTICLE XX | COMPLETE AGREEMENT | 19 |
| ARTICLE XXI | ALTERATION OF AGREEMENT | 20 |
| ARTICLE XXII | SEPARABILITY AND SAVINGS | 21 |
| ARTICLE XXIII | SICK LEAVE | 21 |
| ARTICLE XXIV | DURATION OF AGREEMENT | 22 |

# NATIONAL AGREEMENT

This National Agreement (hereinafter referred to as the "National Agreement") is made and entered into by and between GlobeGround North America LLC d/b/a Servisair/GlobeGround, 111 Great Neck Road, Great Neck, New York 11022 (hereinafter referred to as the "Company") and the INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO, 9000 Machinists Place, Upper Marlboro, Maryland 20772, on its own behalf and on behalf of its affiliated Locals and District Lodges, including any Locals or District Lodges which represent employees at any existing and/or future facilities or operations of the Company (hereinafter referred to as the "Union").

Recent discussions between the Union and the Company, centered on the ever-increasing demands of our diverse customers and the competitive challenges of the marketplace.

There is a mutual recognition by the Union and the Company that we operate in a dynamic, cost-competitive business environment in which customer demands are constantly challenged. A key to success in this type of environment is the continuation of an interest-based working relationship between the parties. Our future success is highly dependent on the quality of the working relationship between both parties.

We believe that people want to work together and be more involved in decisions that affect them. We further believe that they care about their jobs, are concerned about what customers expect and that they care about each other. Employees also want job satisfaction. They desire to take pride in themselves and in their contributions to Company's success. We are convinced that they want to fully utilize their skills and abilities and that they want to share in the success of their efforts. To ensure our collective future success, we must focus on common objectives and operate in the belief that we have more in common than we do in conflict.

Subject to the provisions of the contractual agreements, it is mutually agreed that the successful implementation of high-involvement concepts and an interest-based approach to working together will be greatly enhanced by:

- Creating a work environment that promotes teamwork, mutual trust and respect, equality, and where there is honest and open two-way communication between the Union and the Company.

- Treating people fairly.

- Seeking methods and processes consistent with the provisions of the contractual agreements that involve union officials and management together in improving the way issues are addressed and resolved within the boundaries of the contractual agreements.

- Exploring and implementing, where appropriate, approaches which will help in maximizing the competitive position of the business.

- Continuously improving communication.

While change is difficult, we understand that in this current highly competitive, constantly changing marketplace in which we are engaged, we must continue to change,

subject to the existing provisions of the contractual agreements.  It is our mutual desire and goal to create an interest-based approach to working together, on an ongoing basis and more effectively address the mutual concerns of the parties involved.  This will be done in a manner that will ensure that we make the necessary changes that will allow us to provide the highest quality and value product and service to our customers and to maintain a healthy, thriving work environment for employees and union members.  As we implement this approach, we are committed to creating an atmosphere of mutual trust and respect.


ARTICLE I                        RECOGNITION

Section 1.    The Company recognizes the Union as the sole collective bargaining agent with respect to the rates of pay, wages, hours and other terms and conditions of employment in a collective bargaining unit (herein "the bargaining unit") of all full time and regular part time employees who are employed by the Company in the aviation service business at such Company facilities or operations in the United States of America or any of its territories or dependencies, and of all full time and regular part time employees employed by the Company in the aviation service business at future facilities or operations that the Company acquires, establishes or operates in such aviation service business during the term of this National Agreement within the United States of America or any of its territories or dependencies, but excluding office or clerical employees and excluding professional employees, guards and supervisors as defined in the National Labor Relations Act, and those employees in existing units represented by any other labor organization.


Section 2.    This National Agreement shall apply to all employees in the classifications described in Section 1 above and to all employees employed by the Company in such

classifications in any future facilities or operations that the Company acquires, establishes or operates during the term of this National Agreement within the United States of America or any of its territories or dependencies, when the Union has demonstrated, through appropriate means acceptable to both parties, majority support of the employees within the unit at the new facility or operation, provided that evidence of such majority support need not be demonstrated when such new employees constitute a lawful accretion to an existing unit represented by the Union.

Section 3.  The classifications of employees contained herein do not require the Company to have employees in any such classification.  There will be no restrictions upon the Company using an employee in one (1) classification on a job in any other classification. Such employee will be paid the rate of pay in such classification when performing in that classification; however, in no way will an employee receive a wage rate less than his/her regular rate of pay.  New classifications and the respective wages for those classifications may be added as agreed upon by the Company and the Union.

Section 4.    The Company has the right to use its employees from this bargaining unit or from any other location or source to perform any work required to satisfy its contractual obligations to its customers.

Section 5.    The Company may designate an employee as a "Lead Agent" in any classification.    The selection, number, designation, assignment, and retention of any employee as a "Lead Agent" shall be at the sole discretion of the Company.

Section 6.    The parties agree that the provisions of the Local Supplemental Agreements referred to herein shall continue in effect during the term of each or such agreements.

## ARTICLE II          UNION SHOP

Section1.      It shall be a condition of employment that all employees of the Company in the bargaining unit hereinbefore described, who are members of the Union on the effective date of this National Agreement or the date on which it is executed, whichever is later, shall remain members.  Each other employee in the bargaining unit shall, as a condition of employment, become and remain a member of the Union on the thirty-first (31st) day following the latter of the beginning of his employment or the effective date of this National Agreement or its execution date, or at the end of any probationary or trial period.  This provision shall not be applicable in states where the provision is in violation of the state's right to work laws.

## ARTICLE III          CHECK OFF

Section 1.      Upon receipt of signed authorization cards from employees in the bargaining unit and in accordance with the Labor Management Relations Act of 1947 and all other applicable laws, the Company shall collect initiation fees and Union dues from the employee by deducting such dues from the employee's wages.  The amounts so collected by the Company will be paid over to the Union.

Section 2.      The Union shall defend, indemnify and hold harmless the Company from any claims of liability arising out of the deductions provided for herein.

Section 3.    The Company on request from the Union shall provide to the Union, listings of new employees showing the employee's name, address, date of hire, classification, and rate of pay.

## ARTICLE IV          HOURS OF WORK

Section 1.    The work day shall be up to eight (8) hours of work in a twenty-four (24) hour period, and a work week shall consist of up to five (5) work days.

Section 2.    The Company may employ part time employees in all classifications.  A part time employee is an employee scheduled to work less than forty (40) hours in a work week.

Section 3.    No provision herein shall be construed as a guarantee of hours of work per day or per week or as a guarantee of days of work per week.

Section 4.    The Company may institute staggered shifts or a ten (10) hour workday four (4) days per week.

## ARTICLE V          RATES OF PAY

Section 1.    Provisions governing hourly rates of pay shall be set forth in Local Supplemental Agreements in accordance with Article XX of this National Agreement.

Section 2.    The Company at its sole discretion, may pay to any employee a wage in excess of the hourly rate provided in the Local Supplemental Agreement.

Section 3.    The Company may set up piece rates for particular jobs.

## ARTICLE VI                    OVERTIME

Section 1.    One and one half (1-1/2) times the hourly rate of pay will be paid for all work performed in excess of forty (40) hours in one (1) work week.

Section 2.    Overtime payments shall not be duplicated for the same hours worked by an employee and to the extent that hours are compensated for at overtime rates under one provision of this National Agreement, they shall not be counted as hours worked in determining overtime pay under the same or any other provision of this National Agreement.

Section 3.    The Company shall be the sole judge of when overtime work is required.

Section 4.    In the event overtime work is required, and an insufficient number of employees are available to do the work, the Company will assign overtime work to be worked in the reverse order of seniority among qualified employees on duty.   If such employee(s) refuses to perform such work, he shall be subject to appropriate disciplinary action by the Company.

Section 5.    The Company and the Union agree to review overtime practices as needed from time to time.

## ARTICLE VII          HOLIDAYS

Section 1.    Any employee who has completed the probationary period and is regularly scheduled to work, shall receive holiday pay for eight (8) holidays per year while employed.  Such holidays are listed in each Local Supplemental Agreement.

Section 2.    Holiday pay shall be limited to eight (8) hours of pay for each holiday for full time employees and four (4) hours of pay for part time employees for each holiday, and shall be limited to straight time pay.

Section 3.    An employee who fails to work on a holiday when scheduled to do so, shall not be entitled to holiday pay, and an employee must work as scheduled or assigned on the workday before and the workday following the holiday to be eligible for holiday pay.

Section 4.    Scheduled holidays will be observed by the Company on the legally authorized day upon which they fall.   In the event of conflict between Federal Law and State or Local Law as to the observance, State or Local Law shall control.

ARTICLE VIII              VACATIONS

Section 1.    All full time employees who have completed one (1) year of continuous service with the Company, shall receive one (1) week vacation with pay; those full time employees who have been in the employ of the Company for three (3) years, shall receive two (2) weeks vacation with pay; those full time employees who have been in the employ of the Company for five (5) years, shall receive three (3) weeks vacation with pay

Section 2.    Vacation pay shall be equivalent to forty (40) hours of work multiplied by the regular hourly rate of pay for the employee's classification.

Section 3.    A vacation pick will be done by seniority and be completed no later than December 15th for the next calendar year.

Section 4.    Vacation schedules for each classification will be issued by the Company. The Company may limit the number of employees in each classification

on vacation at one time and the number of weeks of vacation to be taken at one

time.  No employee shall take more than two (2) consecutive work weeks vacation during

the period June 1st to September 30th.


ARTICLE IX          SENIORITY

Section 1.    Required qualifications to perform the work being equal, seniority in each

classification shall prevail in the reduction of forces and the restoration of employees,

provided that the employee with greater seniority is ready, willing and able to perform the

work available.  Seniority preference will prevail for full time employees, and full time

employees shall be considered the higher classification.


Section 2.    The Company will maintain separate seniority lists for full time and part time

employees for each classification at each location.


Section 3.    The right of any employee to be recalled hereunder, after a previous

reduction in the work force, shall expire after a period of one (1) year from the last day

worked, or an amount of time equal to the employee's accumulated seniority, whichever is

less.  The Company will notify eligible employees of restoration of the work force by

mailing certified mail a notice of such restoration to the employee's address which appears

on the records of the Company.  If an employee fails to inform the Company of his desire

to return to work within forty-eight (48) hours after the Company has given the notice

provided herein, the Company shall be under no obligation to recall such employee.

Section 4.    Before being recalled or after being absent from work for any reason for a period of thirty (30) calendar days or longer, an employee shall take such physical examination including substance and alcohol abuse testing and any other

tests as required by the Company, to determine whether he is physically fit and able to perform the required work.


Section 5.    Any employee who has been transferred on a permanent basis to a job outside the bargaining unit, shall lose his seniority.   This provision shall not effect the seniority rights of employees transferred outside the bargaining unit on a temporary basis. Employees transferred out of the bargaining unit on a temporary basis, shall continue to accumulate seniority during the period of such temporary assignment.  The term temporary in this section shall mean up to sixty (60) working days.


Section 6.    The Company will exercise its rights to assign employees to specific shifts as required.  At least once a year, the Company will post a notice of all shifts available and employees shall select the shift they desire on the basis of seniority.  Additional shift picks each year may be conducted by the Company at its discretion.  Employees may only pick for shifts based on their location/seniority.


Section 7.    All new employees shall be employed on a probationary status during the first ninety (90) calendar days.  An employee on probation may be discharged for any reason and such discharge shall not be subject to further recourse in any proceeding. When the probationary period has expired, the employee's seniority shall be computed from the date on which employment commenced.

Section 8.    Seniority shall be lost and an employee will be considered to have quit if he does not report to work or notify the Company of his intention not to report to work for a period of two (2) scheduled work days from his last day of work.

Section 9.    The Company will post at all locations, where there are employees in the same classifications, those openings at another location created by a new start up operation, and will give preference to current employees based upon classification seniority for openings at such new location, provided the employee is ready, willing and able to perform the work available.    Such transfer shall only be between operations encompassing the same work classifications.  In all cases, the transferring employee must be experienced in the performance of the work which is available.    Questions of experience will be determined by the Company, and the Company will determine the number of employees that will transfer.

Section 10.  The Company will send notification to the Director of Collective Bargaining, with a copy to the appropriate local and/or district representatives, to advise of the loss of any customer contract(s).

ARTICLE X              COMPANY MANAGEMENT

Section 1.    It is understood and agreed that the Company retains and possesses all the rights, power, functions, and authority exercised or had by it prior to the execution of this National Agreement, except as explicitly limited by an express provision of this National Agreement.

Section 2.    Management rights include, but are not limited to, the following customary and usual prerogatives:

(a)  Management of the operation, including determination of the size and composition of the work force.

(b)  Direction of the work force including hiring, assigning, promoting, demoting, and laying off of employees.

(c)  Allocation and assignment of work.

(d)  Establishing, amending, changing, and enforcing work rules, practices, regulations, and policies pertaining to employees attendance, conduct and safety, including random drug testing.

(e)  Maintaining discipline.

(f)  Suspending, discharging or disciplining employees, provided that such discipline will be for just cause.

(g)  Introducing new jobs, job classifications or departments.

(h)  Developing, approving, maintaining, and changing all other Company policies, procedures, and practices not set forth in this National Agreement and which are not directly contrary to an express provision of this National Agreement.

(i)  The Company may subcontract any work which it desires, and will notify the Union of such decision.

(j)  Work covered by this National Agreement can be performed by management employees if no bargaining unit employees are immediately available to do the work.

Section 3.    The listing of specific rights in this Article is not intended to be, nor shall be restrictive of, or a waiver of, any of the rights of management not listed, unless specifically surrendered herein, whether or not such rights have been exercised by the Company in the past.

ARTICLE XI                    GRIEVANCE PROCEDURE

Section 1.    For the purpose of this Agreement, as it is defined in Article XX, Sections 1 and 2, the term "Grievance" means any dispute between the Company and the Union concerning interpretation or application of the terms of this Agreement. All grievances relating to the interpretation or application of the provisions of the National

Agreement shall be resolved by the signatories to the National Agreement and this process shall be final and binding on the parties without any right to further review. In the event the parties cannot agree, the signatories as referred to above shall jointly appoint a third person to work with them to resolve the dispute.

Section 2.    With respect to any other grievance not involving the interpretation or application of the provisions of the National Agreement, all grievances shall be processed in accordance with the procedures herein set forth:

(a)    Any grievance that is not presented within seven (7) calendar days from the date the Company, employee or the Union knew or should have know of the fact or facts upon which the grievance is based, need not be considered by the Company as a valid grievance.

(b)    The dispute shall be taken up by the aggrieved employee and the Shop Steward with the Supervisor. The Supervisor must give his answer to the grievance within seven (7) calendar days. If the Supervisor fails to give a timely answer or if no satisfactory settlement is reached between the parties; then,

(c)    The Union shall reduce the grievance to writing and turn it into the Department Manager or other duly authorized management personnel of the Company who will, upon request, agree to meet the appropriate Union representative and the grievant, and the Company will render a written reply. In the event the grievance is not settled in Step (c) then the grievance may be submitted to a panel consisting of three (3) representatives of the Union and three (3) representatives of the Company. The decision of the panel shall be final and binding on all

parties. In the event of a deadlock of the panel either the Union or the Company may proceed to step (d).

(d)     In the event the grievance or dispute is not settled in a manner satisfactory to both parties by the foregoing, then either party has the right to submit such grievance or dispute to arbitration in the manner hereinafter provided.

(e)     Disputes between the Union and the Company may be processed in the first instance directly with the Company as provided in (c) above.


ARTICLE XII          ARBITRATION

Except for grievances relating to the interpretation or application of the provisions of the National Agreement, the arbitration procedure is as follows:

1.     Any grievance not satisfactorily settled in accordance with the procedure outlined in Article XI, may be referred to arbitration by either the Union or the Company by serving a written demand on the other party within ten (10) days following the meeting or meetings referred to in Article XI, Section 2 (c). The Union and the Company are the only parties that can proceed to arbitration.

2.     If the Union and the Company are unable to agree upon an impartial arbitrator within ten (10) days after either party notifies the other party of its decision to arbitrate, either party may request the American Arbitration Association to make the selection in accordance with the usual practices of the Association in this connection.

3.     The arbitrator shall have the authority only to interpret and apply the provisions of the Agreement, but shall have no power to add to, subtract from or change any of the terms of the Agreement. The decision of the arbitrator shall be based solely on the evidence and the arguments presented to him by the respective parties. The decision

of the arbitrator shall be final and binding on the Company, the Union and the employee. The grievance and arbitration procedure provided in this National Agreement shall constitute the sole means for resolving disputes arising under the Agreement.

    4.      The fees for the services of the arbitrator shall be paid equally by the parties.

ARTICLE XIII                    NO STRIKE CLAUSE

Section 1.    The Union agrees during the term of this National Agreement that it will not engage in, encourage or condone any strike, slow-down, interference or interruption of production or service.  The Union agrees during the term of each Local Supplemental Agreement that it will not engage in, encourage or condone any strike, slow-down, interference or interruption of production or service.  The Union shall take all affirmative action to prevent or stop any such strikes, slow-downs, walkouts, or other interference with work, and all employees are required to cross picket lines and report to work.  Any employees that refuses to cross any such picket line and does not report to work may be disciplined by the Company up to and including discharge.

Section 2.    In the event of a legal strike at one Company location resulting from the expiration of a Local Supplemental Agreement, the Union agrees that it will not strike, slow-down, or interfere or interrupt production or service at any other Company location, and all employees are required to cross such picket lines and report to work.  Any employee that refuses to cross any such picket line and does not report to work may be disciplined by the Company up to and including discharge.

Section 3.    Notwithstanding Sections 1 and 2 above, the parties agree that the Company will not discipline an employee that refuses to cross a legal picket line that has been officially sanctioned by the Union.

ARTICLE XIV                    BENEFIT PLANS

Section 1.    Full time employees will be eligible to participate in the Company's Health & Dental Plan (collectively referred to as Company Benefit Plans) and Life Insurance Plan, under the applicable standard terms, conditions, and rules established by the Company for employees covered by this Agreement. The Company and the Union will meet annually to review the claims experience of the Company Benefit Plans and discuss any necessary modifications thereto.

Section 2.    The Company and the Union agree that comparable employee benefit plans may be implemented if such plans are available to the Company provided the Company gives three (3) months notice to the Union.

Section 3.    Should any Federal or State, Social Security Law or other law be enacted and put into effect during the period of this Agreement, providing benefits of the same nature as any of those provided hereunder and imposing the cost thereof on the Company, then and to that extent only, such benefits provided hereunder shall become inoperative and cancelled and the Company shall be relieved of the cost thereof to avoid any duplication of costs.

Section 4.    Employees covered by this Agreement shall become an Eligible Member Group (at dates to be negotiated as part of Local Supplemental Agreements) under the Servisair/GlobeGround Service Group 401(k) Profit Sharing Plan (the 401(k) Plan), and

may participate as per the standard terms, conditions, and rules established, as contained in the 401(k) Plan Document, or any amendment thereto. The Company may make a matching contribution up to a maximum of twenty-five (25) per cent of each Participant's Deferred Compensation, with the percent of match to be negotiated as part of Local Supplemental Agreements.    Notwithstanding the above, in applying the matching percentage negotiated, a maximum of five (5) per cent of annual compensation only will be considered.

ARTICLE XV            PAY FOR DEATH IN FAMILY

Section 1.    In case of death occurring in the immediate family of a full time employee with more than one (1) year of service, payment for time lost due to observance will be approved by the Company up to a maximum of three (3) days.

Section 2.    Maximum payment will not be paid when it results in increased pay for the week; as for example, if death occurs over a weekend, holiday or scheduled day off.  The elapsed days immediately following death shall be regarded as the days for which pay must be considered but only up to and including the date of funeral or burial service.

Section 3.    "Immediate Family" shall mean:  spouse, child, father, mother, brother, sister, mother-in-law, father-in-law, grandmother, and grandfather.

ARTICLE XVI                    JURY DUTY

Section 1.    A full time employee called for jury duty shall be excused from his regular duties on the days he is required to appear in court.  For any regular scheduled workday in which time off for jury duty is granted, the employee shall be

paid eight (8) hours pay at his straight time hourly rate less any amount received as

a jury duty fee, up to a maximum of ten (10) days during one period of jury service.  The employee will be required to turn over to the Company adequate proof of his jury duty service and any compensation received for such jury duty service in order to receive the compensation as provided above.

Section 2.    To receive such jury duty pay the full time employee must have been employed for at least one (1) year at the time of the duty.

Section 3.    The Company shall not be required to pay for jury duty service more than once every two (2) years.

ARTICLE XVII                   GENERAL CONDITIONS

Section 1.    If an employee is injured during working hours and is unable to continue to work on the advice of a physician, he shall be paid at his regular hourly rate of pay for hours he would have worked that workday.

Section 2.    When required by the Company, employees shall attend training sessions to improve their skills.  Payment for attendance at such training sessions, whether or not such training session is on the employee's regular scheduled shift, shall be made at the regular hourly rate of pay for the employee's classification.

ARTICLE XVIII                SHOP STEWARD

Section 1.    The Company recognizes the right of a Shop Steward to act on behalf of employees provided such Union activities shall not interfere with the normal and regular operations of the Company.  The Union agrees to advise the Company in writing, of the name of the Shop Steward who has been authorized to act on behalf of the employees and to notify the Company when changes are made.

Section 2.    The Shop Steward shall suffer no loss of pay for time spent during regular work hours for the processing of any grievance or dispute in accordance with the grievance process set forth herein.


ARTICLE XIX                DISCRIMINATION

Section 1.    Whenever "he" is used in this National Agreement, it shall mean "he" or "she".


Section 2.    The Company agrees that it will not discriminate against applicants for employment, or any present employee, because of race, color, religion, gender, national origin, union membership, or occupationally irrelevant physical handicaps.


ARTICLE XX                COMPLETE AGREEMENT

Section 1.    Supplemental Local Agreements containing other provisions as may be mutually agreed to but not in contradiction of or in conflict with the terms of this National Agreement, shall be negotiated by the Company and the appropriate Local or District of the Union and shall when executed become a part of this National Agreement.



Section 2.    This National Agreement and the Supplemental Local Agreements entered into pursuant to Section 1 shall be considered to constitute the collective bargaining agreement between the parties.    The parties specifically agree that this National Agreement and the Supplemental Local Agreements that are a part of this

National Agreement are the sole and complete Agreement between them covering the bargaining unit as described in Article 1, Section 1 and that any other previous Agreement or Agreements, oral or written, expressed or implied, are of no further force or effect and neither party shall have any liability to the other with respect thereof.    In the event of a conflict between the National Agreement and any Supplemental Local Agreement, the provisions of the National Agreement shall apply.


Section 3.    In the event that the Company suffers competitive business pressures, the parties agree that they will meet and discuss methods to eliminate such pressures.    Any decision to amend the provisions of the National Agreement or any of the Local Supplemental Agreements shall be final and binding on all parties.    Moreover, the parties agree that the signatories to this National Agreement will meet each year during the term of this National Agreement to review monetary issues relating to this National Agreement, and the effectiveness of such National Agreement, provided that all other provisions of this National Agreement remain in effect during the term of the Agreement.


## ARTICLE XXI                    ALTERATION OF AGREEMENT

No agreement, alteration, understanding, variation, waiver or modification of any of the terms or conditions or covenants contained herein shall be made by any employee or group of employees with the Company and in no case shall it be binding upon the parties hereto unless such agreement is made and executed in writing between the parties hereto.

<u>ARTICLE XXII</u>                      <u>SEPARABILITY AND SAVINGS</u>

Section 1.    If any Article or Section of this National Agreement should be held invalid by operation of law or by any tribunal of competent jurisdiction or if compliance with or enforcement or any Article or Section should be restrained by such tribunal, pending a final determination as to its validity, the remainder of this National Agreement, or the application of such Article or Section to persons or circumstances other than those to which it has been held invalid or as to which compliance with or enforcement of has been restrained, shall not be affected thereby.

Section 2.    In the event that any Article or Section is held invalid or enforcement of or compliance with which has been restrained as set forth, the parties affected thereby shall enter into immediate collective bargaining negotiations, upon the request of either party, for the purpose of arriving at a mutually satisfactory replacement.  In the event the parties are unable to agree on a replacement clause, such dispute shall be decided by the signatories to this National Agreement.

<u>ARTICLE XXIII</u>                      <u>SICK LEAVE</u>

Section 1.    The amount of sick leave shall be as negotiated in Local Supplemental Agreements.

Section 2.  Each full time employee who has completed one (1) year of continuous service may be credited with an amount of sick leave (as negotiated in Local Supplemental Agreements).  Thereafter he may continue to accumulate sick leave credit on a pro-rated


basis up to a maximum number of days per calendar year (as negotiated in Local Supplemental Agreements).

Section 3. Part time employees shall not be eligible for any paid sick leave.

Section 4.  Pay for sick leave granted will be calculated on the basis of the employee's regular hourly rate of pay with one (1) day of sick leave equal to the number of hours the employee is regularly scheduled to work, up to a maximum of eight (8) hours of such pay.

Section 5.  An employee shall present evidence of his sickness upon his return to work, including a Doctor's Certificate, if requested by the Company, after a three (3) calendar day absence.

Section 6.  An employee may elect to accumulate unused sick leave from one year to the next, up to a maximum of thirty (30) days, or payment can be made annually, in January, to an employee, who makes a written request to the Company in December, for payment of any or all of the unused sick leave to which he is entitled.

## ARTICLE XXIV          DURATION OF AGREEMENT

Section 1.    This National Agreement shall become effective and binding upon the parties hereto on November 1, 2005 and remain in effect through October 31, 2010, and shall renew for periods of one (1) year thereafter, unless either party hereto shall give written notice to the other of its desire to modify, amend, or terminate this National Agreement on its anniversary date.  Such notice must be given in writing at least sixty (60) days before the anniversary date of this National Agreement.

Section 2.    In the event that this National Agreement is terminated in accordance with Section 1 of this Article, all Supplemental Local Agreements referred to herein shall remain in effect.

IN WITNESS WHEREOF, the parties have hereunto set their hands this _1st_ day of _Dec_ ~~2008~~ _2005 T.C._

FOR THE COMPANY:

GLOBEGROUND NORTH AMERICA LLC
D/B/A SERVISAIR/GLOBEGROUND

By: _____
Fernando DiBenedetto
President & COO

By: _____
Randall P. Davies
Executive Vice President
The Americas

By: _____
Craig B. Allen
Vice President, Human Resources

FOR THE UNION:

INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE
WORKERS, AFL-CIO

By: _____
Thomas O'Heron
Director of Collective
Bargaining

By: _____
James Conigliaro
Directing, Business Representative
District #15

By: _____
Robert J. Motisi
Assistant    Directing    Business
Representative
District #15

# EXHIBIT B

## LOCAL SUPPLEMENTAL AGREEMENT NUMBER TWENTY

### TO THE NATIONAL AGREEMENT
### BETWEEN  PENAUILLE SERVISAIR LLC
### AND
### THE INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS, AFL-CIO
### DISTRICT LODGE 190
### AND ITS AFFILIATED PENINSULA AUTO MACHINISTS LOCAL LODGE 1414

Between:              Penauille Servisair LLC
                      San Francisco International Airport
                      Northwest Airlines Cargo Building 612, Room 210
                      Westfield Road
                      San Francisco, CA 94128

And:                  Peninsula Auto Machinists Local Lodge No. 1414 &
                      Machinists Automotive Trades District Lodge 190
                      IAM & AW
                      150 South Boulevard
                      San Mateo, CA 94402

For:                  SFO Ramp Bargaining Unit

At:                   San Francisco International Airport

Effective from:       December 1, 2006

Whereas, Penauille Servisair, LLC (hereinafter referred to as the "Company") and the International Association of Machinists and Aerospace Workers, AFL-CIO, on its own behalf and on behalf of its affiliated Local Lodges and District Lodges (hereinafter referred to as the "Union") have entered into a National Agreement recognizing the Union as the sole collective bargaining representative with respect to rates of pay, wages, hours and other terms and conditions of employment in a collective bargaining unit of all full time and regular part time employees by the Company in the aviation service business.

Whereas, the Union has demonstrated through appropriate means acceptable to both parties majority support of the employees within the unit set forth below at San Francisco International Airport, the Company recognizes the Union as the collective bargaining representative (as more fully prescribed and described in the National Agreement), for the following Bargaining Unit.

The Bargaining Unit is described as **ramp agents, aircraft cleaners and ground support equipment mechanics** employed by the Company at the San Francisco International Airport (hereinafter referred to as the SFO Ramp Bargaining Unit).

## LOCAL SUPPLEMENTAL AGREEMENT NUMBER TWENTY

Whereas, the National Agreement referred to above provides for hours of work, overtime, and other terms and conditions of employment, and all employees within the unit covered by this Local Supplemental Agreement are subject to such provisions whether or not the National Agreement is or continues in effect.

Whereas, the National Agreement referred to above provides that hourly rates of pay, a listing of holidays, provisions concerning employee benefit plans, term, and other provisions may be mutually agreed to but not in contradiction of or in conflict with the terms of the National Agreement shall be negotiated by the Company and the appropriate Local or District of the Union and that any such items shall be set forth in a Local Supplemental Agreement which when executed shall become a part of the National Agreement.

Whereas, the Union and the Company have conducted negotiations and agree that this Local Supplemental Agreement covering the SFO Ramp Bargaining Unit shall be effective as of December 1, 2006 and shall remain in effect through and including November 30, 2011 and thereafter shall be deemed automatically renewed for periods of (1) year, unless either party hereto shall give written notice to the other of its desire to modify, amend or terminate this Agreement on its expiration date (such notice must be given in writing at least sixty (60) days prior to the expiration date).

Now, therefore, the Union and the Company agree to the following:

### ARTICLE II- UNION SHOP

Add a new Section 2.    The Union will send notice to the Company and the employee, certified mail, return receipt requested, of the requirement for discharge where an employee is not in good standing with the Union. The Company will discharge the employee and provide a copy of the termination notice to the Union.

### ARTICLE IV- HOURS OF WORK

Add a new Section 5.    Schedules and actual hours worked are based on customer requirements. Part time employees shall be regularly scheduled to work not less than three (3) hours per shift.  Based on these requirements, the Company will make reasonable efforts to regularly schedule non-split shifts and consecutive days off, however, split shifts and non-consecutive days off will be scheduled when the Company deems they are required.  Split shifts shall be scheduled with not more than four (4) hours between the regularly scheduled shifts; however, this requirement will be waived upon request of an employee.  An unpaid meal period of thirty (30) or sixty (60) minutes shall be scheduled near the middle of each employee's shift of more than four (4) hours. The Company will comply with provisions for rest periods and meal breaks required by California State Labor Code.

Add a new Section 6.    In the event an employee reports to work as scheduled and is ready and able to work but there is no work available, the employee will be paid for at least one-half of his scheduled hours, with a minimum of two (2) hours

## LOCAL SUPPLEMENTAL AGREEMENT NUMBER TWENTY

and a maximum of four (4) hours, unless the reason for no work being available is beyond the control of the Company due to: threats to persons or property; a recommendation or requirement of civil authorities to close the workplace; a public utility failure; an Act of God; or other cause not within the Company's control.

Add a new Section 7.    The regular starting and stopping time for work shifts shall be scheduled and posted at least seven (7) calendar days in advance, if possible. If a change in the regular work schedule is required, the Company shall notify the employee prior to the end of their last regularly scheduled shift if possible, or will call the employee with as much advance notice as practical. However, this Section shall not apply if the schedule change is necessitated by an Act of God, business interruption, or customer needs of which the Company did not have advance notice.

Add a new Section 8.    Where an employee who is not scheduled to work is called in the employee shall receive a shift of at least four (4) hours. If an employee is called back (called by the Company and required to return to work after the employee has clocked out and left the workplace), said employee shall be paid at least three (3) hours.

Add a new Section 9.    Effective December 18, 2006, employee "leads" shall receive  $1.75 per hour in the first (1st) through third (3rd) year of this Agreement, and $2.00 per hour in the fourth (4th) and fifth (5th) year of this Agreement above their classification rate of pay. The Company may designate an employee as a Lead in any classification. The number, designation, assignment, and retention of any employee as a Lead shall be at the sole discretion of the Company.

## ARTICLE V – RATES OF PAY

Add a new Section 4.    Effective January 1, 2007  $11.50 per hour shall be the minimum wage rate in effect for Full time Ramp Agents, Aircraft Cleaners, and GSE Mechanics, and adjusted on each January 1 thereafter, based on the annual percentage change in the Bay Area Cities Consumer Price Index as published by the San Francisco Airport Commission pursuant to the San Francisco International Airport Quality Standards Program (QSP).  These wages reflect the "with benefits" rate called for in the QSP.

Effective January 1, 2007, $12.75 per hour shall be the minimum wage rate in effect for Part time Ramp Agents, Aircraft Cleaners, and GSE Mechanics and adjusted on each January 1 thereafter, based on the annual percentage change in the Bay Area Cities Consumer Price Index as published by the San Francisco Airport Commission pursuant to the San Francisco International Airport Quality Standards Program (QSP).  These wages reflect the "without benefits" rate called for in the QSP.

If the QSP is terminated or modified significantly, the Company and the Union agree to negotiate appropriate changes to the wages and benefits in this Agreement (including health insurance, vacation, sick leave and other compensated and non-compensated days off plus any other area that becomes a requirement of

## LOCAL SUPPLEMENTAL AGREEMENT NUMBER TWENTY

the QSP). Any and all such changes would be contained in an amendment to this Local Supplemental Agreement. The parties agree, pursuant to subsection 12P.10 of the San Francisco Minimum Compensation Ordinance ("MCO") to waive the application thereof to this Agreement.

Add a new Section 5.    Active Bargaining Unit employees as of the ratification date of this agreement, that have maintained active continuous employment, and were hired prior to April 1, 2003, plus former full and part-time ASIG (Delta Cabin Cleaning Service) employees hired as of April 23, 2003, shall receive a longevity compensation payment based on their Full Time/Part Time status on each future annual anniversary of continuous active employment, as follows:

Full Time      $300

Part Time      $200

## ARTICLE VI- OVERTIME

Add a new Section 6.    All employees who work more than eight (8) hours or ten (10) hours, where scheduled for such, in a workday shall be compensated for such hours at the rate of one and one-half times their regular rate of pay.

Double time shall be paid for all hours worked over the twelfth (12) hour in the workday.

Add a new Section 7.    Senior qualified employees shall have the first right of refusal to work overtime.

## ARTICLE VII- HOLIDAYS

The following language will **replace Section 1.** of this Article from the National Agreement:      The Company observes the following holidays:  New Year's Day, President's Day, Memorial Day, Independence Day (4th of July), Labor Day, Thanksgiving Day, Christmas Eve Day, and Christmas Day.

Effective December 1, 2006, the Employee's Birthday shall be added to the above Company observed holidays, and effective December 1, 2010 one (1) additional Floating Holiday shall be added.

The following language shall **replace Section 2.** of this Article in the National Agreement:      Employees who have completed the probationary period who work on one of these holidays, shall receive two (2) times his hourly rate of pay for all hours worked on a holiday, provided that the employee has worked his regularly scheduled days before and after the holiday.  Employees scheduled to work on a holiday that do not report for work shall not receive any pay for holiday.

## LOCAL SUPPLEMENTAL AGREEMENT NUMBER TWENTY

The following rules apply only to Full Time employees who have completed the probationary period:

1. If such employees are on a regular day off on a holiday, they will be paid eight (8) hours at straight time for the holiday.

2. If such employees are on a leave of absence, they will not receive pay for holiday.

3. If such employees are on vacation in the week that a holiday falls, they will be paid for eight (8) hours at straight time for the holiday and the holiday will NOT be counted as vacation day.

## ARTICLE VIII- VACATIONS

Add a new Section 5.      Vacation pay shall be computed at the employee's regular rate of pay at the time the vacation is taken.

Add a new Section 6.      Employees are expected to schedule and take vacation earned. The Company shall not reasonably deny scheduling and taking earned vacation. Vacation time must be used within one (1) year of it being earned or the right to take the time off will be forfeited and the employee will be paid for his vacation.  Unused vacation and pro-rata vacation pay for the current year will be paid out upon termination of employment to those employees who return all uniforms and other company issued property.

## ARTICLE IX- SENIORITY

The following language **shall replace Section 6.** of this Article in the National Agreement:      The Company will exercise its rights to assign employees to specific shifts as required.  At least twice a year, with no less than seven (7) days notice, and tied to daylight saving time change, the Company will post a notice of all shifts available and employees shall select the shift they desire on the basis of seniority.  Additional shift picks each year may be conducted by the Company at its discretion.  Employees may only pick for shifts based on their location/seniority.

Add a new Section 10.      Unpaid leaves of absence shall be granted for periods not to exceed thirty (30) days in any calendar year, to employees who attend a Union convention, conference, or meeting, provided the number of employees on leave at any given time does not interfere with the Company's operations. The Union will provide the Company with a minimum of ten (10) days written notice of any planned attendance at such events.

Add a new Section 11.      When an employee voluntarily transfers to full time or another higher classification, he shall retain (but not accrue) his seniority in the part time or lower classification and will be placed at the bottom of the seniority list in the new, full time or higher classification. If an employee voluntarily transfers from full time or higher classification to part time or other lower classification, he shall lose his seniority in the full time or higher classification and will be placed at the bottom

of the seniority list in the new part time or lower classification. If an employee is forced due to layoff or inability to select a shift, to transfer from full time or higher classification to a part time or other lower classification, he shall retain his seniority in the full time or higher classification and will be placed on the seniority list in the new part time or lower classification based on the seniority he held in his prior full time or higher classification.

Employees who transfer into the Bargaining Unit from another Union Bargaining Unit shall retain Company seniority but shall be placed at the bottom of the seniority list in the new classification.

Employees who are regularly scheduled to work forty (40) hours per workweek shall be considered full time.

## ARTICLE X- COMPANY MANAGEMENT

Add a new Section 4.      The Company may lease, outsource, or contract out for goods and services from any source of supply whatsoever due to the unavailability of qualified Bargaining Unit employees or due to the fact that it would be inefficient to have the work performed by Bargaining Unit employees. Any decision to subcontract any Bargaining Unit work that would result in the layoff of any Bargaining Unit employee will be discussed with the Union.

Except for cases of instructional training, relief periods, absenteeism, to ensure adequate customer service, that do not exceed four hours in duration, Non-bargaining unit employees may not perform work covered by this Agreement. In cases of Start Up, emergency, or acts of God, the Company reserves the right to assign employees to perform the work.

## ARTICLE XIV- BENEFIT PLANS

Add a new Section 4.      Notwithstanding the language in Section 1, when Full Time employees become eligible to have health insurance coverage, the contribution by the Company shall equal the full cost of Single (Employee Only) coverage under the Cigna SEPO plan.   Should a different benefit plan be introduced as per Section 2 of this Article, the Company contribution will continue to be equal to the full cost of Single (Employee Only) coverage under the base plan offered.   Part Time employees may participate, at their sole cost, and without Company contribution, in the Company's Health & Dental Plan.

Add a new Section 5.      Employees covered by this Agreement shall become an Eligible Member Group as of July 1, 2003, under the Penauille Servisair Service Group 401 (k) Profit Sharing Plan (the 401 (k) Plan), and may participate as per the standard terms, conditions, and eligibility rules established, as contained in the 401 (k) Plan Document or any amendment thereto. The Company will make a matching contribution of twenty-five (25) percent of each Participant's Deferred Compensation, up to a maximum of five (5) percent of annual compensation.

LOCAL SUPPLEMENTAL AGREEMENT NUMBER TWENTY

## ARTICLE XV- PAY FOR DEATH IN FAMILY

The following language **shall replace Section 3.** of this Article in the National Agreement:    "Immediate Family" shall mean: spouse, domestic partner, child, stepchild, father, mother, stepparent, brother, sister, stepbrother, stepsister, mother-in-law, father-in-law, grandmother, and grandfather.

## ARTICLE XVII- GENERAL CONDITIONS

Add a new Section 3.    Employees will be required to wear uniforms as furnished by the Company at no cost to the employee. The Company shall also provide rain gear for employees assigned to work in the rain. Jackets will be provided befitting the season of the year and the job classification.

Add a new Section 4.    The Company agrees to continue to hold Safety Committee meetings on a regular basis with employee participation. Any safety related issues will be discussed at these meetings. Employees attending such meetings will be paid for time involved, at their regular rate of pay.

Add a new Section 5.    The Company shall make earplugs available to employees, at its expense. Employees who perform lavatory servicing will be provided with rubber gloves and face shields appropriate to the task. Aircraft Cleaners will be provided with disposable latex gloves.

Add a new Section 6.    In all grievance cases, the employee and the Union Representative shall have access to personnel records applicable to the employee disciplinary action, prior to the holding of any investigation. An employee may, upon request, review his service record, and be given a copy of any disciplinary record placed in his service record.

Add a new Section 7.    The Company shall provide a locked, glass-enclosed Union Bulletin Board, in each shop or facility, with a key to be retained by the Shop Steward. The board shall be identified with the words "International Association of Machinists District 190, Local Lodge 1414".

Add a new Section 8.    The Company will pay one-half of the employee's cost for parking at the airport-designated employee parking area.

Add a new Section 9.    All rules, policies and bulletins effecting wages, hours of work and/or working conditions shall be available to all employees. Copies may be requested through an employee's immediate Supervisor for any specific area of interest.

Add a new Section 10.    All employees are permitted to wear an official Union badge or official Shop Steward badge provided such badges are easily detachable from employee's uniform and do not obscure the employee's security or customs identification badges. Under no circumstances shall such Union or Shop Steward

LOCAL SUPPLEMENTAL AGREEMENT NUMBER TWENTY

badges contain anything negatively reflecting upon the Company, any of its employees, or any of its customers.

## ARTICLE XVIII- SHOP STEWARDS

Add a new Section 3.    The Union shall designate the number and placement of all Shop Stewards who shall enjoy Super Seniority for the purposes of Shift Bid and Lay Off only. A District Lodge 190 Representative who may, or may not be, an employee of the Company, shall further represent the Union. No employee of the Company may engage in any Union business, including any discussions concerning alleged violations of this Agreement or processing of grievances, during work time. Working time does not include breaks and meal periods where such Union business does not interfere with the Company's normal operations.

## ARTICLE XXIII- SICK LEAVE

The following language **shall replace Section 2.** of this Article in the National Agreement:    Each Full Time employee will be credited with one day of paid sick leave per month, starting at the end of the month after he completes his probationary period. Full Time employees will continue to accumulate one day for each one additional month worked up to a maximum of seven (7) per calendar year until the January 1st following his first anniversary of date of hire. Upon that January 1st and each subsequent January 1st thereafter, employees shall be credited with seven (7) days of paid sick leave. Paid sick leave must be used in whole day increments only.

Add a new Section 7.    Each Full Time employee shall be granted up to ten (10) unpaid days of leave per year for sickness or other reasons. Full Time employees will be credited with one day of unpaid leave per month, starting at the end of the month after he completes his probationary period. Full Time employees will continue to accumulate one day for each one additional month worked up to a maximum of ten (10) per calendar year until the January 1st following his first anniversary of date of hire. Upon that January 1st and each subsequent January 1st thereafter, employees shall be credited with ten (10) days unpaid leave. Unpaid leave can only be used after the employee has exhausted all paid sick leave and vacation available. Unpaid leave must be used in whole day increments only and must be requested by the employee in advance and approved by the Company. Unpaid leave time may not be carried over from one year to the next year.

**The National Agreement and this Local Supplemental Agreement Number Twenty shall be considered to constitute the collective bargaining agreement between the parties covering the SFO Ramp Bargaining Unit.**

**LOCAL SUPPLEMENTAL AGREEMENT NUMBER TWENTY**

For the Company:                    For the Union:


**Penauille Servisair LLC**          **PENINSULA AUTO MACHINISTS
                                     Local Lodge 1414 and
                                     MACHINISTS AUTOMOTIVE
                                     TRADES DISTRICT LODGE 190
                                     OF THE INTERNATIONAL
                                     ASSOCIATION OF MACHINIST
                                     AND AEROSPACE WORKERS,
                                     AFL-CIO**


By: _____          By: _____
    Eric Jennings                         Pedro Mendez
    General Manager                       Business Representative
                                         District Lodge 190, IAM&AW


By: _____          By: _____
    Joe McConnell
    Regional Director US West



San Francisco International Airport

# Quality Standards Program

**Revised as of 2-25-08**

## I.  Overview

The San Francisco Airport Commission ("Commission") adopted the Quality Standards Program (the "Program"), as referenced in the Airport's Rules and Regulations, to enhance security and safety at San Francisco International Airport. The Program applies to any firm, including airline and concession tenants and third party vendors (collectively, "Covered Employers"), that employs personnel involved in performing services which directly impact safety and/or security.

This Program is part of the Airport's Rules and Regulations and is administered by the Airport Compliance Officer to ensure that the covered employers are aware of the Program requirements and to ensure compliance with the general standards.  The Compliance Officer will monitor and enforce these requirements.

Covered Employers are required to be in compliance with this Program, as well as, all other applicable Airport operating requirements, (including leases and permits), Rules and Regulations, and Airport Directives.

## II.  General Standards

The Program focuses on four (4) general areas:

| Areas | General Standards |
|---|---|
| • Hiring Practices | – High School Diploma or equivalent work experience<br>– English proficiency |
| • Training | – Initial Training Program<br>– Recurrent Training Program<br>– Record Retention Guidelines |
| • Equipment Standards | – Routine maintenance program<br>– Response time for non-routine maintenance<br>– A User Check Log |
| • Compensation | – Minimum hourly wage is $11.88 with Benefits; $13.13 without Benefits |

## III.  Employees Covered by the Program

1

The Program is applicable to employees of Covered Employers who: (1) require the issuance of an Airport badge with AOA access and work in and around the AOA in the performance of their duties; or (2) are directly involved in passenger and facility security, including checkpoint screening, passenger check-in, skycap and baggage check-in and handling services, and AOA perimeter control. The Program is applicable to all existing Covered Employers as well as new entrants.

## Employees Impacting Security

✈ Employees in this category include those directly engaged in performing checkpoint security screening, passenger check-in activities, skycap and baggage check-in and handling services, and AOA perimeter control.

Part 1544 of Transportation Safety Regulations (TSR) governs air carriers and their Covered Employers and sets forth basic quality standards for the areas outlined in Section II, except compensation. Airport Staff has developed enhanced quality standards for Covered Employers in Security to ensure the highest level of security at San Francisco International Airport. Standards will be deemed updated to reflect changes in TSR Part 1544 or other changes to TSR which may be pertinent to the application of this Program for covered employees.

## Employees Impacting Safety

Employees in this category include those directly engaged in activities impacting safety within the AOA. These employees include, but are not limited to the following:

✈ Employees providing ramp handling functions, including aircraft cleaning, fueling, and baggage/cargo handling;

✈ Employees operating catering vehicles regularly on the AOA for the purpose of servicing aircraft; and

✈ Other employees issued an Airport badge with AOA access working in and around the AOA in the performance of their duties.

2

Note: Additional detailed standards for safety and security will be applicable to any companies applying for QSP certification.

## IV.  Benefits and Compensation

Covered Employers are required to provide a minimum compensation/benefits offering for employees engaged in providing safety/security services. The implementation of a compensation/benefits package, in response to the Program, shall not result in the reduction of the overall value of the existing compensation/benefits program.

### Benefits

- Company paid membership in a group medical plan should be at least equivalent to the group rate of an HMO membership with the most members in California. (This benefit must become effective no later than 90 days after employment.)

- Twelve (12) paid days off per year

- Ten (10) days of un-paid leave per year

- Paid and un-paid days off may be accrued during the first year of employment

- All paid leave must be exhausted prior to use of un-paid leave.

### Compensation

- The Minimum Compensation Level will be adjusted annually in accordance with the Bay Area Cities – Consumer Price Index.

- Adjustments to the minimum, based on October data, will be effective January 1st of each year thereafter; unless notified otherwise by the Airport Commission.

## V.  Process

### Certification

A certification process will occur in which all of the criteria outlined on Attachments A and/or B will be reviewed with each Covered Employer.  Airport staff will conduct the certification review.

<u>Third Party Vendors</u>

When Airport staff is satisfied that a Covered Employer is in compliance with the Program, an operating permit will be issued. Any airline desiring to contract for these types of services with a third party vendor, that has not yet been certified, must contact the Aviation Management Division to begin the review process. The operating permit will outline the permitted services, as well as, the conditions under which business must be conducted at the Airport.

<u>Airlines and Concessionaires</u>

Lessees, permittees and concessionaires are required to comply with the Airport Rules and Regulations, including this Program, pursuant to their respective agreements.

### Annual Certification and Audit Rights

On or before July 1st of each year, each Covered Employer shall deliver to the Airport Director a statement certifying that it is in compliance with the Program. The Airport reserves the right to review and audit such compliance at any time. Airport staff will conduct all audits to ensure continuing compliance. If at any time, a Covered Employer is found to be in non-compliance, the Airport will give notice to the Covered Employer and allow a reasonable cure period to address the noted deficiency; unless such deficiency is considered an endangerment, at which point, operations must cease until the deficiency is corrected.  Such notice to third party Covered employers will include a copy to all known airlines contracting for the Covered Employer's service at the Airport.

**Default**

Any non-compliance with the Program will be considered a default under the Covered Employer's agreement with the Airport. If the default is not cured within the time period specified in the Airport's notice, the Airport may exercise all remedies available, including, but not limited to, the imposition of fines and the termination of any and all agreements with the Airport.

**Non-Compliance**

Upon receipt of any notice of non-compliance with the Program, the Covered Employer must promptly take action to cure such non-compliance. If the non-compliance is not cured within the time period specified in the Airport's notice, the Airport may exercise all remedies available, including, but not limited to, the imposition of fines and the termination of any and all agreements with the Airport.

**Fines**

If a Covered Employer defaults with respect to any requirement of the Program, the Airport Director may elect to impose a fine equal to $200.00 per violation, per day. The Airport's right to impose such fines shall be in addition to and not in lieu of any and all other rights available to the Airport. Such fine amount may be increased from time to time, at the discretion of the Airport Director.

## VI. Airport Compliance Officer for the Quality Standards Program

The Airport has assigned a Compliance Officer to oversee and ensure that the Covered Employers are in compliance with the Program. This assigned person will be the main contact for managing the Quality Standards Program and addressing complaints or issues from Covered Employers and their employees working in the safety/security service areas at the SFIA.

For additional information about the Airport's Quality Standards Program, call the Compliance Officer at (650) 821-1005 from 8:00 am to 4:30pm, Monday – Friday, or contact us via email at: SFO.QSP@flysfo.com.

# QUALITY STANDARDS PROGRAM
## Annual Employer Certification

Covered Employer: _____ _Servicon_ _____

Lease/Permit Number _____ _3838_ _____

In accordance with Airport Rules and Regulations and Section 3.5 of the Aviation Support Services Permit (if applicable), the undersigned, authorized on behalf of the Covered Employer, is certifying that:

1.   The Covered Employer is in full compliance with all provisions of the Quality Standards Program including, but not limited to: hiring, training, equipment and Compensation and Benefits standards as they currently exist.

2.   The Covered Employer has provided (1) a current list of all airlines to whom Covered Employer is providing Permitted Services, (2) a list of services provided to each airline, and (3) the total number of employees, covered by the QSP, currently employed.

I hereby certify that all statements made in this report are true and correct to the best of my knowledge.  I understand that any false, incomplete or incorrect statements, regardless of when they are discovered, may result in the Covered Employer's loss of certification under the Airport Rules and Regulations/Quality Standards Program.

**Signature:** _____

**Name:** _____ _Eric Jennings_ _____
           (please print)

**Title:** _____ _General Manager_ _____

**Date:** _____ _July 3, 2008_ _____

# SFO Quality Standards Program
## BENEFITS AND COMPENSATION

*Instructions: Please make a copy of this form on your company letterhead stationery and respond to all of the following questions:*

Does (Company Name) _____
offer to both fulltime and parttime employees . . .

| | Yes | No |
|---|---|---|
| Company-paid membership in a group medical plan (HMO) that is at least equivalent to the group rate of an HMO membership with the most members in California? | | |
| A minimum of twelve (12) paid days off per year? (This requirement may include sick and/or vacation days but does not include paid holidays). | | |
| A minimum of ten (10) <u>unpaid</u> days off per year? This requirement allows companies to stipulate that all paid days off <u>shall be exhausted</u> prior to the use of any unpaid days off. | | |
| Effective January 1, 2008, compensation that is minimally $11.88 per hour with the aforementioned benefits? | | |
| Effective January 1, 2008, compensation that is minimally $13.13 per hour without the aforementioned benefits? | | |
| The option of making a compensation selection of $11.88 per hour plus the aforementioned benefits or $13.13 per hour without the aforementioned benefits? | | |

| Signature | Date |
|---|---|
| Print Name | Title |

# QUALITY STANDARDS PROGRAM
## Annual Employer Certification

### ATTACHMENT

Covered Employer:

_[handwritten]_

1.  Name of Airline(s):

    _[handwritten]_

    Services provided: _[handwritten]_

    _[handwritten]_

    _[handwritten]_

    Name of Airline(s):

    _[handwritten]_

    Services provided: _[handwritten] Ramp, Cabin Cleaning_

    Name of Airline(s):

    _[handwritten] China Airlines  Hawaiian Airlines_

    Services provided: _[handwritten] China  Ramp_

    _Hawaiian, Ramp, Cabin Cleaning Cabin Search_

2.  Total number of current employees covered under the Quality Standards Program:

    _[handwritten] 300_

    Date: _[handwritten] 7/7/08_

**Note: Complete this attachment and return with Annual Employer Certification Form and the Benefits and Compensation form.**